Counsel, you may proceed. Good morning, Your Honors. May it please the Court. My name is Lisbeth Caldames and I represent the petitioner in this case, Ms. Carol Cadiena. Ms. Cadiena is a female native and citizen of the Philippines who seeks asylum and withholding of removal due to past persecution and well-founded fear of future persecution at the hands of the NPA, which is the New People's Army, a communist rebel group in the Philippines. She is seeking this relief based on the grounds of political opinion and membership in a particular social group, that particular social group being her nuclear family, the Cadiena family, which is a family of wealthy, consists of wealthy landowners and business owners and who have campaigned against the New People's Army. Counsel, what troubles me in this case is not that the prior generation was targeted by the NPA, but that this individual person was not targeted by the NPA. Actually, Your Honor, there is evidence on the record that she was targeted and that the family as a unit was targeted. In her own capacity? I'm sorry? In her own capacity, not just because she was part of the other family? No, just as a family member, as a family member. Whenever the threats were issued, the threats were issued, many of the threats, they were issued to a family altogether, not just to her, I mean, not just to the parents in this case. Isn't there evidence of a failed attempt to attack her jitney on the way to school? Yes, Your Honor. The car that regularly transported the kids to the school was intercepted by the New People's Army, and on that incident, they specifically asked for the Cadiena children, and according to the jitney drivers, they became very upset when they couldn't find them, and they searched everyone that was in the car. And that is one of the strongest cases where she has that she was particularly targeted herself, not just because of the family. What's the record tell us about the reputation of the Cadiena family generally for being anti-communist in the Philippines? The parents, they were wealthy landowners, and so they had a lot of communication with the people in the area. They did a lot of campaigning against the NPA, trying to convince them to not contribute, to not pay the taxes, and also to be vigilant against the anti-communist activity. And as a result of that, that brought more activity from the military to that area. But was the notoriety of the family name limited to one region, or would that name be known throughout the Philippines as a family that's opposed to communism? It was mainly in that region, Your Honor. But part of the argument in this case is that the NPA is strong throughout the Philippines, not just in that area. And in this case, the petitioner, she would be recognized at some point. I mean, she might be able to live, you know, for a while undetected, but eventually the NPA would catch up to her.  And there's a lot of documentation on the record to show that people that they consider their enemies, they, you know, they pursue them. Well, now, she's been here for 14 years. Are you suggesting that the NPA has her targeted consistently over these 14 years and they're ready to do her harm if she comes back to the Philippines? No, Your Honor. There was no evidence in the record regarding that specifically. But what we argue in that case is that you have to, whether you're considering relocation, you have to look at the reasonableness of that situation. In this case, this is a single woman who would be returning to the Philippines by herself, the entire family, the immediate family, they're all living in the United States legally now. Well, why wasn't she granted LPR status? She aged out, Your Honor. So basically she turned 21, which is the reason why she had to file her own asylum application. Did the BIA reach the internal relocation issue? They touched upon it basically on the question that you just asked, that she has been here over 10 years, but they definitely did not conduct an individualized assessment as to what the reasonableness is of her having her go back. So if we were inclined to agree with you on the well-founded fear issue, it would still require a remand to the agency to make a particularized examination of this issue, relocation, whether internal relocation was possible? I don't believe so, Your Honor, because I believe that there is a lot of evidence on the record to show. But we review what the BIA did, correct? That's correct, Your Honor. And if they didn't reach the issue, where are we? Yes, Your Honor. Perhaps, yes. Okay. Your Honor, I would like any more questions, or if I may reserve my time. You may reserve your remaining time, counsel, certainly. We'll hear from the agency. Good morning, Your Honors. Leah Durant on behalf of the Attorney General and Respondent in this case. Good morning. Is it accurate that the entire family is here legally? I do believe that her immediate family is here. Other father, siblings? Her one brother, I believe, yes. They were able to adjust her status for other reasons. But it is due to, it should be noted, Your Honor, that the Petitioner's Counsel mentions that she was on her mother's application, but she aged out. However, that application was never adjudicated because the mother was able to adjust her status based on a family-based petition. Does she have any claim with respect to her mother or father that's still viable? Does Ms. Kadena? No. We do not believe that she does, Your Honor, because ---- And strictly because it's too late. Exactly. Well, not necessarily because it's too late, but just on the merits, she doesn't have a claim as our position. No, no. I'm not talking about persecution. I'm talking about the LPR grant that her parents got. Normally, the cases I've seen, normally that includes the children. And I'm just kind of curious why it didn't include her in this case. Oh, I see. Yes. You know, they were included. Her and her brother were included on that application. Then when they turned 21, they no longer were able to be considered as derivatives on her ---- on their mother's application. And how much ---- how much beyond age 21 were they when their parents did get the LPR? To be honest, I'm not positive about that. I know when they came to the United States, her and her brother were 16 and 17 years old. And when did they file? When did the parents file? I believe her mother's application was filed ---- gosh, I know she filed her own application on June 3rd of 1999. And like I said, I know when they came here, they were 16 and 17, and then by the time she turned 21 is when, you know, she was no longer ---- I was just wondering if ---- is this a situation where they were of age when she filed, but the processing time took them beyond that age? I do believe that they were. They were of age at the time that the mother filed, I believe. Okay. But basically, our position in this case is that Ms. Cadena does not have ---- does not have the substantial evidence basically establishes the finding that Ms. Cadena did not suffer any persecution whatsoever. And it's clear on the record, and the record doesn't compel a contrary conclusion, and this results given the fact that, you know, she never had any encounter with the NPA whatsoever. She was never harmed. She never suffered anything. She was never threatened. So for these reasons ---- What about this incident involving the jitney on the way to school? Yes. Well, the record ---- It doesn't count? Well, it doesn't rise to the ---- even if she could rely on that incident, it doesn't rise to the level of persecution. Nothing happened as a result of that incident. She wasn't even there. She wasn't present. She never suffered any actual suffering or harm due to the NPA or anyone else. It is entirely possible, is it not, for an asylum seeker to fail to meet their burden on past persecution, but still establish under the law a well-founded fear of future prosecution, right? Yes. Because what happens if you fail on past persecution, you don't get the presumption. Exactly. But in this case ---- So this is a family that consistently opposed these communist guerrillas and received threats and fled the country and became lawfully admitted here. Are they citizens by now? I believe they have all been able to adjust their status. I don't know if they're citizens. The last time I checked, I think her brother was a lawful permanent resident and the others, like I said, came on family-based petitions. So, you know, they're all here lawfully. However, although she would be able to ---- Although an individual could basically obtain asylum based on having a well-founded fear, the immigration judge and the board determined that she did not have a well-founded fear for numerous reasons. I think it does bear noting, given the fact that she has been gone from the Philippines for this amount of time. Also, the record does indicate that her own mother, after leaving the Philippines, went back to the Philippines on several occasions, and that directly cuts against any well-founded fear that she may have. And also, her father did even acquiesce in his testimony, did say that, well, you know, it's unlikely that the MPA would recognize her. So for these reasons, we would assert that she has not established that she has a well-founded fear. Let's suppose, let's just play a little role for a minute. And you're in your current job, and I've had the good fortune of becoming the Attorney General of the United States. And somehow, because a congressman or a senator calls me about this case, I ask you to come into my office. And I read the file, and I said, we don't really want to send this woman back, do we? Is there any way I, as the Attorney General of the United States, can exercise my discretion to keep her here? What would your response be? Well, my response would be that, given the regulations, I mean, she would need to show that something happened to her. I'm not talking about what went on before the IG. I'm the Attorney General now. And I have a – I've taken a personal interest in this case. And I want to know if I have any discretion anywhere within the immigration and naturalization laws to allow this woman to remain in the country. Do I? Yes. The Attorney General does have the discretion to grant asylum. However, in this particular case, especially given this circuit's – Under humanitarian grounds, I'm not sure. But I know the Attorney General does have discretion to grant asylum while pulling a removal. We're still playing this role. Sure. You're my lawyer. How do I do this? On humanitarian grounds? Yes, ma'am. That, I have to say, I'm not an expert on. I'm not exactly sure of how the Attorney General would go about that based on humanitarian grounds. But I do know that, you know, given this record, nothing has happened to Ms. Cadena whatsoever. And she, as a matter of fact, has not even – You're focusing on the persecution issue. I think perhaps Judge Hawkins, and I share his view on this, is focused on the fact that this is a family of four people. The parents and the brother apparently have LPR status. And for this technical reason, she was over 21. She didn't make it. And that just seems unfortunate. Well, however, her mother's application was never adjudicated, remember. So that's what – What does that mean? It was – it never went before the immigration judge because she got her status before it ever – her application was never decided. So that's not to say that – She got a green card while the application was pending. Exactly. So it never – Through her husband, probably. Well, I don't think – I don't know for a fact that it was through her husband. Right. But I know that it was a family-based petition, so it may have been. But hers was never decided, so it's not as if, you know, that her information was determined to be persecution and that Ms. Cadena was just aged out and through some technicality was not able to – Look at it from this point of view. In 1994, the parents and the two children came to this country. Today, the parents and one of the children are all green-carded. They have adjusted status. This daughter does not. What can be done to help her? You know, it is true that they were able to, you know, find other ways of adjusting their status. In this case, unless Ms. Cadena was able to show, which she did not below, that she suffered persecution or that something happened to her, that, you know, people would still be looking for her. She just simply, upon this record, it just – she cannot establish that she warrants a granting of asylum. And so for these reasons, the immigration judge's findings should be upheld. She cannot show that she has a well-founded fear. Again, her own family, her own mother, traveled back to the Philippines on several occasions, and she admits that. So for these reasons, she simply cannot meet the burden. I mean, as this Court has stated numerous times, persecution is an extreme concept. When Ms. Cadena cannot show that anything happened to her at all, she simply can't meet the burden of showing past persecution at all, and she furthermore can't show that she had a well-founded fear. So, and additionally, our position is that the immigration judge was proper to go back to decide the issue of past persecution on remand. He was not precluded from deciding this issue because this issue had not been determined at all. Are there any time limitations to applying for humanitarian relief? That I'm not sure. I can do research on that, Your Honor. Let's assume there are not and that the Petitioner here could apply for, to the Attorney General, for the exercise of humanitarian allowance. Would the government oppose that? I, to be honest, I'm not sure. I would believe that you're not talking about based on asylum here. We're talking about just pure humanitarian reasons. No. Under the scenario we were talking about just a few minutes ago, I'm the Attorney General of the United States, and I'm determined, if it's lawful, if I have that scope of discretion, to allow this woman to stay. I do believe that the government would oppose that. Why? Because Ms. Kadena, given the record in this case, nothing, absolutely nothing has happened to her. You're still talking asylum? Yes, I understand. Okay. Yes. In other words, I'm over on humanitarian. Yes. Okay. Why would you oppose humanitarian relief? Because, for a couple of different reasons. The first is that Ms. Kadena and her brother, Ms. Kadena and her brother came to this country and remaining for longer than permitted, they conceded that. That is true of 99.99% of people who seek relief, at least the ones that get to this court. So, why else? Well, because. I thought humanitarian meant you had a big heart. You had a, you had some compassion. Understood. Yes. Well, I just. So, you're telling me in my role as U.S. Attorney General, don't be a humanitarian. Don't exercise any compassion. Break this family up. No, no, not at all. What I am saying is that given the current state of the immigration law, which we do allow for people to come lawfully and to adjust their status, Ms. Kadena just, she cannot, she absolutely has failed to meet this burden whatsoever. And, you know, because of that, the law basically cuts against her in this case. I mean, we do have humanitarian effort, humanitarian ways for people to come. But, unfortunately, she can't meet, she can't meet it in this case because she can't show that anything happened to her. All right. And so, for those reasons, Your Honor, we would ask that the immigration judge's finding be upheld. Thank you, counsel. Thank you very much. Ms. Galdames, you have some reserved time. Your Honors, I wanted to point out that one of the key things that were not considered by the prior courts was the cumulative effect of all the incidents that happened not just to Ms. Kadena, but also to her family. What about her mother going back several times? Your Honor, twice. Pardon? She went back twice. That's what I said, several times. Two times she's gone back without incident. Isn't that pretty compelling? No. That's not correct, Your Honor. Not without incident. She went twice, and the reason why she says why she went twice was because she was concerned about Ms. Kadena and her other children. So that's why she went back. When she came to the U.S., was specific. But she wasn't persecuted when she went back. The NPA didn't accost her or try to capture her or anything. She the threats continued, Your Honor, even after she went back. For example, on August of 1990, she returned to the Philippines, and she said, you know, because she was worried about the Petitioner and her other kids. Well, now, wait a minute. We're talking about, and I understand from the file, this case began in 1994, May 31, 1994, when they first came to the United States. Yes. All right. And apparently she has gone back to the Philippines twice since 1994. No, Your Honor. The times that she has gone back were the father came first because he was the main target of the persecution in 1990. And so where the government is getting that the mother went back is that the mother came with the father in 1990, the first time, to the U.S. But then the mother was very worried about the children, so she went back. Were they still there at that time, the children? I'm sorry? Were the children still in the Philippines when she went back the first time? Yes, they were. They were. The children, initially, when some of the threats started to get more serious, the children also went into hiding along with the parents. But when the parents decided to come to the U.S., they remained with the grandmother in the Philippines. So, okay, so the mother came to the U.S. first time in 1990. She was here, I think, about a month and a half or two months. She returned because she was worried about the kids. And she actually asked the father to remain in the U.S., because everybody figured that he was the main target of the NPA. And so she figured if he stayed here, then the rest of the family would be fine. Doesn't that cut against your case? The whole idea is if she goes back alone 14 years after she was last there, I'm talking about the petitioner here now, not the mother, isn't it likely she'll have the benefit of that, that the NPA won't care about her? They really cared, if they cared at all, about her father. But that's the thing, Your Honor, that when the mother went back, after that, that's when the Jeepney incident happened. That's when more threats continued to happen. So the fact that the father was here did not prevent the NPA from continuing to persecute the family. So, Your Honor, I just wanted to make that point that even though she wasn't physically harmed, the cumulative effect of everything else does amount to past persecution. And also, as far as to well-founded fear of future persecution, this Court can find that if there's even a 10 percent chance that she will be persecuted, then she's eligible for that type of relief. And based on the evidence and the continuous strength of the NPA, it can't be said that she doesn't have at least that, at least a 10 percent chance that she would be persecuted. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision, and the Court will take its morning recess.
judges: O'scannlain, Hawkins, Selna